By the Court.—Ingraham, J.
This action was brought to set aside an account stated between the parties, and for an accounting. The court below found that the settlement of February 14, 1883, was based on a representation made by defendants as to the amount for which the stock was sold; that such representation was false; and as a conclusion of law, the court found that the statement of the account between the parties, and the agreement based thereon, should be set aside.
This finding is amply sustained by the evidence, and it is only necessary on this point to say that we agree with the court below.
The account being opened, the main question arises under the final agreement of March 9, 1882. • To properly understand this agreement, it is necessary to state the relations which at the time it was made, existed between the parties to this action, and between the defendants and Reynolds and Abbott.
Under the contracts as they existed prior to March 9, 1882, defendants had purchased from plaintiffs a certain number of shares of the capital stock of The La Platt Mining and Smelting Co., and had the right to purchase the balance of the shares of the capital stock of the said company belonging to the plaintiffs, and were to pay therefor a price fixed, and in addition' to such price one half of all profits received by the defendants on the sale of the said shares. There is no evidence of any intention to form a copartnership between the parties hereto, and there is no agreement that the plaintiffs should be liable for any loss.
After the execution of this agreement between the parties hereto, the defendants made an agreement with William H. Reynolds, whereby the defendants agreed to give to said Reynolds a one half interest in said con *41 tract and in all net profits arising therefrom. Reynolds was to proceed to England and give his time and attention to placing the said shares of stock, and all profits derived, either directly or indirectly, out of the contract were to be divided in equal portions between Reynolds on the one part and the defendants on the other.'
It is clear that under this agreement between the defendants and Reynolds, the latter became an assignee of one half of defendants’ contract. It was defendants’ interest that was assigned, not plaintiffs’, and Reynolds was to have a share in the money made by defendants out of the agreement with the plaintiffs. By the agreements all expenses incurred in selling the stock were to be paid by the defendants, so that before there would be any money coming to Reynolds, all such expenses, including commissions, would have to be paid. The amount that would be due to Reynolds therefore, was neither an expense nor a commission, but was simply a share of the profits that the defendants would realize out of the contract after deducting the expenses and commissions; and whatever the relation that existed between the defendants and Reynolds, he could not be said to represent, in any way, the plaintiffs or to act for them. Reynolds went to London and subsequently made, with the assent of the defendants, an agreement with a London stock broker named Abbott, whereby Abbott was to pay for the shares of stock at a certain fixed price, and the profits that he realized on the sale of the stock over and above such price, were to be paid, three fourths to Abbott and one fourth to Reynolds, and any loss on the sale of the stock below the price fixed should be borne by Reynolds and Abbott in the same proportion.
On March 9, 1882, the agreement between the plaintiffs and defendants was modified. Up to that time, the only stock that had been sold by Reynolds or Abbott was the stock that had been purchased absolutely by the defendants and in which the plaintiffs had no contingent interest. The plaintiffs swear that at *42 that time they had no knowledge of the terms of the agreement between defendants and Reynolds, although they had been informed that .Reynolds was acting for defendants and was to receive from them compensation.
The agreement of that date modifies the agreements theretofore made, as to the amount of stock to be called at the several dates, and the price which the defendants were to pay for the stock to be called, and provides that in respect to twenty thousand shares of stock which were to be called on or before April 19, 1882, the price to be received by the plaintiffs should be five dollars per share and one half of the profits received by defendants on the said twenty thousand shares between the price of five dollars and the price at which said shares should be sold, after deducting all expenses and commissions, and further agreeing that in all subsequent calls of shares which might be made in pursuance of the contracts, the price which should be received by plaintiffs should be five dollars per share and an equal division of the profits which might accrue to defendants personally, between the price of five dollars per share and the average price at which all the shares should be sold, after deducting the expenses and commissions.
Under this agreement, the plaintiffs’ stock was placed with a bank in London, and was delivered to Reynolds on payment by .him of five dollars per share, and the amount of five dollars per share was paid to the bank for account of the plaintiffs.
The court, below held that the defendants should be charged, as the profits on the sale of the stock, the difference between the five dollars per share paid to plaintiffs and the amount received from Abbott, including the one fourth of the profit on the sale of the stock paid to Reynolds by Abbott under his agreement, and that the amounts paid to Reynolds under his agreement with defendants were not to be credited to the defendants as an expense or commission.
It is clear that the amount paid to Reynolds.cannot *43 be said to be an expense or commission. As before stated, Reynolds was not an agent of the plaintiffs or in any way acting for them. He was defendants’ associate, engaged with them in carrying out the contract and to receive one half of the profits that under the contract between the plaintiffs and defendants would accrue to the defendants. What was paid to him was paid as the assignee of one half of defendants’ interest in the contract. It is claimed however, that under this contract the amount received by Reynolds was not profit Avhich accrued to the defendants personally, under the provisions of the agreement that the plaintiffs shall be entitled to an equal division of the profits which may accrue to defendants personally between the price of five dollars per share and the average price at which all the shares should be sold.
The court found that the average price at which the shares were sold was eight dollars forty-two and eighty-eight one hundredths per cent. ($8.42^0) per share, which made the profits per share three and forty-two one hundredths dollars ($3.42). That was the profit between the price of five dollars per share and the average price at which the shares were sold. But did that accrue to the defendants personally ?
The relation that existed between Reynolds and the defendants must be clearly kept in mind in determining this question. He occupied the position of the assignee of one half of the contracts that had been made, and was to receive one half of the defendants’ interest in the contract; but before Reynolds was entitled to anything, there must be a profit that would accrue to the defendants on the contract. They must receive that profit. It must accrue to them before it could be paid to Reynolds, and the profit that was to be divided was the difference between the price of five dollars per share and the average price at which all the shares should be sold. Whether the profits were to be divided between two or three persons did not change their character. *44 The difference between the price fixed and the average price at which the stock was sold was, by the terms of the agreement, to be the profits that were to be divided, and Reynolds was to have, under his agreement, one half of the amount made by defendants out of the contract. The fact that the defendants had agreed to divide the profits coming to them did not, as between the parties to the agreement of March 9, make the defendants’ share any greater or less, or make it any the less the profit that would accrue to defendants that was to be divided between the defendants and Reynolds. Before Reynolds was entitled to anything, there must be profits to which, under the agreement, defendants were entitled, and such profits, as between the parties to the agreement, would be profits which would accrue to the defendants personally.
There was considerable testimony on the trial as to the statements made and the negotiations which resulted in this contract of March 9. The defendants requested the trial judge to find that the terms of the contract between the defendants and Reynolds were stated to ¡plaintiffs, and that they had full knowledge of the same, but this request the trial judge refused.
The intention of the parties to this agreement is not clear, but I am of the opinion that the court was right in holding that the share of Reynolds was not a charge for commissions and expenses, and the defendants were properly charged in the account with that sum.
On the accounting before the referee under the interlocutory judgment, the defendants presented an account in which they claimed credit for certain payments made by them. It appears that, on the accounting between the parties on February 14, 1883, it was agreed that there was a charge against the plaintiffs arising out of the difference in exchange of money received by them of $2,900. This amount the referee allowed. It was also agreed that among the items to be charged to plaintiffs was one for $1,500, H. Allen’s London expenses. *45 Instead of allowing the $1,500 at that time agreed upon, as the amount of Allen’s expenses to London, the referee allowed $391.. It was also agreed on February 14, the time of the settlement, that the defendants should be allowed $34.50 for cables under date of November 20, and that amount the referee also refused to allow. We think that these three sums should have been allowed to defendants.
At the time of the settlement of the account, the parties agreed upon the credits named. The accounting was set aside on the ground of a misstatement of the amount for which the stock sold. There was no dispute at the time, nor is it now alleged, that there was any false representations as to the amount of expenses to be charged to the plaintiffs for defendant Allen’s trip to Europe, or for the $34.50 for cables, and I see no reason why the agreement that such amounts should be charged against the plaintiffs should not be sustained.
In Carpenter v. Kent (4 East. Rep. 580), it is said by the court of appeals: “ Where an account has been adjusted by the parties, if any mistake is subsequently discovered, the whole account need not be opened, but the mistake can be corrected, and the rights of the parties be re-adjusted as to such mistake.”
The plaintiffs appeal from the refusal of the court to charge the defendants with the amount paid for selling the stock. By the agreement of March- 9, plaintiffs were to receive, in addition to the five dollars per share, one half of the profits after deducting the expenses and commissions. Whether there was a sale of the stock to Abbott, or whether Abbott was paid a commission of three fourths the amount realized over the price fixed in the agreement with him is not material. In neither case would defendants be chargeable with the amount paid to Abbott.
We agree with the referee in disallowing the other items, for the reasons stated by him.
The judgment should therefore be modified by de *46 ducting from the balance found due, the sum of $1,109, the difference between the $1,500, agreed to be allowed for defendant Allen’s trip to Europe, and the $391 allowed to him by the referee, and the sum of $34.50 for cables, making $1,143.50, and the interest on that sum from February 14,1883, to the date of the referee’s report, and, as so modified, the judgment is affirmed without costs of the appeal.
Sedgwick, Ch. J.. concurred.